**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES STEEL MINING
COMPANY, INCORPORATED,
                           *Petitioner,*

v.

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR;
NESSEL ALESHIRE, Widow of Chester
A. Aleshire, deceased,
                           *Respondents.*

No. 01-2345

On Petition for Review of an Order of the
Benefits Review Board.
(00-1109-BLA, 99-0909-BLA)

Argued: June 3, 2002

Decided: July 17, 2002

Before MICHAEL and GREGORY, Circuit Judges, and
Bobby R. BALDOCK, Senior Circuit Judge of the
United States Court of Appeals for the Tenth Circuit,
sitting by designation.

---

Affirmed by unpublished opinion. Senior Judge Baldock wrote the
opinion, in which Judge Michael and Judge Gregory joined.

---

## COUNSEL

**ARGUED:** Howard Gerald Salisbury, Jr., KAY, CASTO &
CHANEY, P.L.L.C., Charleston, West Virginia, for Petitioner. Ray
Edmond Ratliff, Jr., Charleston, West Virginia, for Respondents.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

## OPINION

BALDOCK, Circuit Judge:

Chester Aleshire worked in coal mining operations for over twenty-seven years. Following his death, his widow applied for survivor benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901-962 (BLBA). United States Steel Mining Company (U.S. Steel), Mr. Aleshire's former employer, challenged its obligation to pay the benefits. After an evidentiary hearing, an Administrative Law Judge (ALJ) awarded benefits to Mrs. Aleshire. U.S. Steel appealed to the United States Department of Labor (USDL) Benefits Review Board, and the Board affirmed. U.S. Steel now appeals to this Court. We have jurisdiction pursuant to 33 U.S.C. § 921(c). We affirm.

I.

Chester Aleshire worked for over twenty-seven years at various coal mining operations, including approximately fourteen years with U.S. Steel. Mr. Aleshire died on August 20, 1997, while hospitalized following his second heart attack. His widow, Nessel Aleshire, applied for survivor benefits under the BLBA and the regulations promulgated thereunder, 20 C.F.R. Parts 718 and 725. The BLBA provides benefits for coal miners who are totally disabled due to pneumoconiosis or to survivors of miners who die from pneumoconiosis. 30 U.S.C. § 901.

Pneumoconiosis is a chronic dust disease of the lung arising out of coal mine employment. *Id.* § 902(b); 20 C.F.R. § 718.201. To be eligible for benefits, a survivor must prove (1) the miner had pneumoconiosis; (2) the miner's pneumoconiosis arose out of coal mine employment; and (3) the miner's death was due to pneumoconiosis. *See* 20 C.F.R. § 718.205(a). The claimant has the burden of establishing these elements by a preponderance of the evidence. *U.S. Steel Min. Co., Inc. v. Director, Office of Workers' Comp. Programs*, 187 F.3d 384, 388 (4th Cir. 1999).

The USDL Director of the Office of Workers' Compensation Programs (OWCP) made an initial finding that Mrs. Aleshire was eligible for benefits. U.S. Steel challenged its obligation to pay benefits to Mrs. Aleshire, and the matter was set for a hearing before an ALJ. At the hearing, U.S. Steel admitted Mr. Aleshire qualified under the Act as a miner for at least twenty-seven years, and that U.S. Steel is the employer responsible for paying any benefits awarded.[1] The company denied an obligation to pay benefits, however, because U.S. Steel contended Mr. Aleshire did not have pneumoconiosis, and, even if he had the condition, pneumoconiosis did not significantly contribute to or hasten his death.

Under the Act and regulations, a miner or his survivor may establish the miner suffered from pneumoconiosis in four ways: (1) x-ray, (2) autopsy result, (3) presumption, or (4) reasoned medical opinion. *See* 20 C.F.R. § 718.202(a)(1)-(4). The ALJ determined Mrs. Aleshire failed to prove her husband had pneumoconiosis by x-ray,[2] autopsy result,[3] or presumption.[4] The ALJ found, however, Mrs. Aleshire suc-

---

[1]U.S. Steel is the responsible employer because it was the coal mine operator that most recently employed Mr. Aleshire. *See* 20 C.F.R. § 725.495(a)(1).

[2]The ALJ determined the x-ray evidence was inconclusive under § 718.202(a)(1). Several x-ray readings indicated pneumoconiosis, while others did not. Further, Dr. Gaziano, the OWCP Director's reviewing consultant, found pneumoconiosis on one reading, yet found no pneumoconiosis on another reading a few months later. The ALJ noted that this finding was inconsistent with the progressive nature of pneumoconiosis.

[3]The ALJ considered both the autopsy report by Dr. DeJosef, as well as Dr. Bush's consultation report. Based on these reports, the ALJ concluded Mrs. Aleshire failed to prove pneumoconiosis by autopsy results under § 718.202(a)(2) because the autopsy did not make a clear and definitive diagnosis of pneumoconiosis, and Dr. Bush's examination of the autopsy tissues specifically rejected such a diagnosis.

[4]The ALJ found Mrs. Aleshire failed to prove pneumoconiosis by presumption under § 718.202(a)(3) because nothing in the record indicated she qualified for any of the three presumptions referred to in this section. First, Mrs. Aleshire was not entitled to the presumption in 20 C.F.R. § 718.304 because no evidence supported the finding Mr. Aleshire suffered from complicated pneumoconiosis. Second, Mrs. Aleshire was not entitled to the presumption in 20 C.F.R. § 718.305 because she filed her claim for benefits after January 1, 1982. Finally, she was not entitled to the presumption under 20 C.F.R. § 718.306 because Mr. Aleshire died after March 1, 1978.

cessfully established pneumoconiosis under § 718.202(a)(4). Under that provision, notwithstanding a negative x-ray, a finding of pneumoconiosis may be made if a physician, exercising reasoned medical judgment, finds the miner suffered from pneumoconiosis as defined in 20 C.F.R. § 718.201. Section 718.201 defines pneumoconiosis as "a chronic dust disease of the lung and its sequelae, including respiratory or pulmonary impairments, arising out of coal mine employment. This definition includes both medical, or 'clinical', pneumoconiosis and statutory, or 'legal', pneumoconiosis." Medical pneumoconiosis is a clinical diagnosis of pneumoconiosis. Legal pneumoconiosis, on the other hand, includes various pulmonary and respiratory disorders which are not included in the medical diagnosis of pneumoconiosis. Thus, a coal miner may have legal pneumoconiosis even if he does not have medical pneumoconiosis. *See Hobbs v. Clinchfield Coal Co.*, 45 F.3d 819, 821 (4th Cir. 1995).

At the hearing, the parties presented various medical opinions. Dr. Curtis Dehmlow, Mr. Aleshire's attending physician at death, completed the death certificate. Although both parties contended the death certificate is illegible, the ALJ found the cause of death on the death certificate to be "overwhelming sepsis and respiratory infection." Dr. Aniano B. DeJosef conducted the autopsy. The autopsy report listed the cause of death as "septicemia, klebsiella pneumoniae." The autopsy final diagnosis, however, included a host of conditions, including "chronic obstructive pulmonary disease, marked interstitial fibrosis, marked with anthracotic pigments." Dr. Dehmlow subsequently reviewed the autopsy report and concluded the interstitial fibrosis with anthracotic pigments was

> a classic pathological finding of "black lung" and means that the . . . coal dust [was] inhaled into his lung in such a fashion that . . . this patient had black lung disease and . . . that it contributed significantly to his respiratory failure and subsequent death because it predisposed him to ventilatory support and thus pneumonia and terminal sepsis.

Additionally, Mrs. Aleshire presented the opinions of physicians who had treated Mr. Aleshire during his life. Dr. Melchor F. Vidal, who treated Mr. Aleshire for chronic obstructive pulmonary disease and heart problems, concluded that "due to the past histories such as

a miner for 32 years & treatment, & diagnosis of co-worker[5] pneumoconiosis," the disease contributed "to a significant degree" to Mr. Aleshire's death. Dr. Martin Fritzhand treated Mr. Aleshire in 1980 for worsening shortness of breath. Dr. Fritzhand diagnosed Mr. Aleshire with chronic obstructive pulmonary disease, and concluded Mr. Aleshire's chronic shortness of breath was due to his long exposure to coal dust. Dr. Fritzhand's conclusion was based on the miner's history of worsening shortness of breath, extensive coal mining history, physical examination, chest x-ray, pulmonary function test, and arterial blood gas tests. Dr. Pathom Thavaradhara, who examined Mr. Aleshire in 1986 for increased shortness of breath, diagnosed pneumoconiosis based on Mr. Aleshire's history in coal mining, a chest x-ray, pulmonary function and blood gas studies.

In addition to these medical opinions, the OWCP Director consulted Dr. Dominic J. Gaziano, a B-reader[6] who is Board-certified in Internal Medicine and Chest Disease, for an opinion in this case. Dr. Gaziano reviewed Mr. Aleshire's case file and answered a series of questions posed by the Claims Examiner on a form. Dr. Gaziano indicated (1) Mr. Aleshire had pneumoconiosis; (2) he was not totally disabled due to the condition prior to his death; (3) his death was not due to pneumoconiosis; (4) his death was not caused by complications from pneumoconiosis, (5) he did not have complicated pneumoconiosis; however, (6) pneumoconiosis was a substantially contributing cause or factor leading to Mr. Aleshire's death.

U.S. Steel presented the sole contrary opinion of Dr. Stephen T. Bush, a well-credentialed pathologist. Dr. Bush examined Mr. Aleshire's medical records, the autopsy report, Dr. Dehmlow's opinion, and thirty-five histologic slides of tissues from the autopsy. Dr. Bush concluded, "I can state with reasonable medical certainty that the lungs show no occupational disease, specifically no coalworkers' pneumoconiosis." Dr. Bush concluded Mr. Aleshire had adult respiratory distress syndrome as a result of hypotension and infection. Dr. Bush specifically rejected Dr. Dehmlow's diagnosis of black lung, by

---

[5]Presumably the doctor meant "coalworker."

[6]A B-reader has demonstrated proficiency in evaluating x-rays. *See* 20 C.F.R. § 718.202(a)(1)(ii)(E).

contrasting the findings in the autopsy with those normally associated with black lung.[7]

After reviewing these conflicting medical opinions, the ALJ determined that "although the evidence is inconclusive regarding whether the miner suffered from 'medical' pneumoconiosis, he clearly suffered from 'legal' pneumoconiosis (*i.e.*, a respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment.)." The ALJ also found Mr. Aleshire's death was "due to" pneumoconiosis. Pursuant to § 718.205(c)(4), a miner's death will be considered "due to" pneumoconiosis if pneumoconiosis was a substantially contributing cause of death, even if another primary cause of death is identified. The ALJ found that although pneumoconiosis was not the direct cause of Mr. Aleshire's death, the weight of the evidence indicated pneumoconiosis was a substantially contributing cause of his death. Specifically, the ALJ relied on the opinions of Drs. Dehmlow, Vidal, and Gaziano. Only Dr. Bush's report contradicted these opinions. The ALJ found that the opinion of the majority of physicians was consistent with Mr. Aleshire's lengthy employment in the coal mining industry, his long and worsening history of shortness of breath, abnormalities in clinical tests, and his death by a respiratory-related cause. Accordingly, the ALJ awarded benefits to Mrs. Aleshire.

---

[7]Dr. Bush explained in his report:

> The quoted portions of the microscopic description by the autopsy pathologist do not describe lesions resulting from coal-mine dust exposure. Coalworker micronodules consist of black dust pigment in macrophages and free in the tissue associated with a fibrous reaction forming stellate lesions surrounded by dilated air spaces. In contrast, the histologic slides show black dust pigment beneath the pleura but virtually none in the lung substance. Groups of alveolar macrophages contain a yellow-brown pigment most consistent with iron resulting from chronic congestive heart failure. Diffuse interstitial fibrosis is not a feature of coalworkers' disease. In this case the interstitial fibrosis is relatively young collagen rather than the dense collagen of a chronic process of long duration. The histologic changes in the lungs as observed and described by me and as observed and described by Dr. Dejosef bear no resemblance to the changes of coalworkers' pneumoconiosis.

## II.

We review an order of the USDL Benefits Review Board by independently reviewing the record to determine whether the ALJ's findings of fact were supported by substantial evidence. *Island Creek Coal Co. v. Compton*, 211 F.3d 203, 207 (4th Cir. 2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 207-08. We review the legal conclusions of the Board and the ALJ de novo. *Id.* at 208.

## A.

U.S. Steel first contends the ALJ's finding that Mr. Aleshire suffered from pneumoconiosis is not supported by substantial evidence. U.S. Steel argues the ALJ erred by failing to give the proper weight to the only two opinions—the autopsy report by Dr. DeJosef, and the consultation report by Dr. Bush—that were based on actually viewing the autopsy slides. Neither of these two reports diagnosed Mr. Aleshire with pneumoconiosis. U.S. Steel contends the other doctors rendered unsupported and conclusory opinions based on Mr. Aleshire's employment history, and not on objective medical evidence.

The ALJ specifically found Mr. Aleshire had "legal" pneumoconiosis, as opposed to "medical" pneumoconiosis. As we have previously explained,

> Although "coal workers' pneumoconiosis" may be used synonymously with pneumoconiosis in medical circles, the two terms are distinct legally. First, § 718.201 includes coal workers' pneumoconiosis as only one of several possible ailments which could satisfy the legal definition of pneumoconiosis. Furthermore, the comparative breadth of the legal definition contained in § 718.201 is indicated by its inclusion of certain disorders which medically are different from pneumoconiosis. . . . Although all of the disorders explicitly mentioned in § 718.201 are medically similar, *what is important is that a medical diagnosis finding no coal workers' pneumoconiosis is not equivalent to a legal finding of no pneumoconiosis. Clearly, the legal definition of pneumo-*

> *coniosis contained in §718.201 is significantly broader than the medical definition.*

*Hobbs*, 45 F.3d at 821 (emphasis added). For example, chronic obstructive pulmonary disorder is encompassed within the legal definition of pneumoconiosis under the Act. 20 C.F.R. §718.201(a)(2) (listing chronic obstructive pulmonary disease as a type of "legal" pneumoconiosis); *Warth v. Southern Ohio Coal Co.*, 60 F.3d 173, 175 (4th Cir. 1995) ("Chronic obstructive lung disease thus is encompassed within the definition of pneumoconiosis for purposes of entitlement to Black Lung benefits.").

The ALJ relied on five concurring medical opinions, ranging from Mr. Aleshire's treating physicians to a board certified specialist, that Mr. Aleshire had pneumoconiosis or chronic obstructive pulmonary disorder as a result of his coal mining employment. These opinions were based on work history, medical history, physical examinations, x-rays, pulmonary function studies, blood gas tests, and Mr. Aleshire's death from a respiratory-related cause. The ALJ considered and rejected Dr. Bush's sole contrary opinion, which made a medical finding of no pneumoconiosis. Although Dr. Bush's report states that at death Mr. Aleshire suffered from adult respiratory syndrome resulting from hypotension and infection, Dr. Bush does not explicitly address whether Mr. Aleshire's chronic respiratory problems dating back several years were a result of his work in the coal mines, *i.e.*, whether he suffered from any form of legal pneumoconiosis. The ALJ's finding of legal pneumoconiosis therefore was supported by substantial evidence.

### B.

U.S. Steel also asserts the ALJ's determination that pneumoconiosis substantially contributed to Mr. Aleshire's death was not supported by substantial evidence. Pneumoconiosis substantially contributes to a miner's death if the disease hastens death in any way. *Piney Mountain Coal Co. v. Mays*, 176 F.3d 753, 757 (4th Cir. 1999) (citing *Shuff v. Cedar Coal Co.*, 967 F.2d 977, 979-80 (4th Cir. 1992)). U.S. Steel again argues the ALJ erred by relying on several doctors' conclusory and unsupported statements that pneumoconiosis caused Mr. Aleshire's death. U.S. Steel argues the doctors' conclu-

sory opinions are not reliable, probative, and substantial evidence upon which to base a finding that pneumoconiosis hastened Mr. Aleshire's death. *See U.S. Steel Min. Co.*, 187 F.3d at 389.

The ALJ's finding of causation was based on substantial evidence in the form of several doctors' opinions, which in turn were based on medical history, employment history, physical exams, x-rays, clinical tests, and the autopsy report which listed chronic obstructive pulmonary disease, a form of legal pneumoconiosis, as one of several causes of death. Drs. Dehmlow, Vidal, and Gaziano concluded pneumoconiosis was either a direct or contributing cause of Mr. Aleshire's death. Unlike the doctor in *U.S. Steel Min. Co.* who opined that it was "possible" the miner died from pneumoconiosis, Drs. Dehmlow, Vidal, and Gaziano definitively concluded pneumoconiosis contributed to Mr. Aleshire's death. *Compare id.* at 389-90. The ALJ credited these opinions as most consistent with Mr. Aleshire's employment history, long history of chronic and worsening respiratory problems, abnormalities in Mr. Aleshire's clinical tests over the years, and his death from a respiratory-related cause.

Dr. Bush's contrary opinion relied on his conclusion that Mr. Aleshire did not have pneumoconiosis. Because the ALJ had substantial evidence to find Mr. Aleshire had legal pneumoconiosis, the ALJ was free to reject Dr. Bush's contrary conclusion that Mr. Aleshire did not die from the disease. *Compton*, 211 F.3d at 214 (where ALJ has found pneumoconiosis exists, ALJ may reject physician's opinion pneumoconiosis did not cause death where the physician's causation analysis depends upon his opinion that the miner did not have pneumoconiosis).

### III.

In sum, the ALJ's findings that Mr. Aleshire had pneumoconiosis and that the disease hastened Mr. Aleshire's death are supported by substantial evidence. We therefore affirm the Benefits Review Board's decision affirming the ALJ's grant of survivor benefits to Mrs. Aleshire.

*AFFIRMED*